# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>BRIKYLE WALLS | Case No. 20-CR-00710-1<br><br>Judge John Robert Blakey |

## MEMORANDUM OPINION AND ORDER

On August 11, 2020, Chicago Police Officers executed a traffic stop on a brown vehicle driven by its sole occupant, the Defendant, Brikyle Walls. The Defendant, who has several Illinois felony convictions, possessed a loaded firearm in the car's center console, and officers arrested him. In September 2020, the Grand Jury indicted him for unlawful possession of a firearm—namely, a loaded Sturm, Ruger model EC9s 9-millimeter caliber pistol, in violation of 18 U.S.C. §§ 922(g)(1). *See* [2].

On October 7, 2024, Defendant moved to suppress a statement he made to police during the stop, as well as evidence seized during the stop, including the firearm, arguing that the traffic stop violated the Constitution. *See* [121].

### I.   Court Proceedings

On November 22, 2024, this Court held an evidentiary hearing to resolve any factual disputes arising from the Defendant's motion. The Government called the two officers who stopped Defendant, Chicago Police Officers James Kinney and Franson. The Government also admitted into evidence the officers' body worn camera

(BWC) footage and a map of the area where Defendant and the officers were driving. The Defense called Defendant, Brikyle Walls, who conceded under oath that he was driving with a "heavy foot" when stopped. The Defense further admitted the two tickets issued to the Defendant at the traffic stop, a defense-made video of the driving route, the arrest report (CB) and case report (RD), and Officer Franson's state grand jury testimony. The parties also stipulated that when traffic tickets are issued at the same time as a felony violation, the traffic ticket(s) get folded into the felony proceedings and would not proceed in traffic court. The parties later filed additional agreed stipulations regarding the distance of the driving route.

Following the hearing, the Court took Defendant's motion under advisement. This ruling constitutes this Court's findings of fact and conclusions of law on the Defendant's motion.

## II. Findings of Fact

### A. Credibility Determinations

As an initial matter, based upon the in-court proceedings, the Court makes the factual finding that Defendant Walls lacked credibility while testifying on the witness stand. During his testimony, Defendant made a variety of assertions that were contradicted by audio-video recordings or other credible evidence.[1] For example,

---

[1] Based upon the in-court proceedings, this Court also makes the factual finding that both officers testified credibly. *United States v. Thurman*, 889 F.3d 356, 366 (7th Cir. 2018) (Generally, the trial court's credibility determinations are entitled to deference "because, unlike our review of transcripts, the district court 'had the opportunity to listen to testimony and observe the demeanor of witnesses at the suppression hearing.'") (quoting *United States v. Biggs*, 491 F.3d 616, 621 (7th Cir. 2007) and *United States v. Parker*, 469 F.3d 1074, 1077 (7th Cir. 2006)).

Defendant's assertion that he was driving at, or below, the speed limit[2] conflicts with the parties' agreed stipulations about the distance traveled by the Defendant from Maryland Avenue to Drexel Avenue,[3] Defendant's own video of the route,[4] and the officers' BWC videos.[5] This fatal flaw in Defendant's testimony is but one of many undermining his credibility.[6] In short, the record dooms the Defendant's credibility

---

[2] Defendant testified that he was driving about 20 miles per hour on Maryland Ave, 13 miles per hour after he turned onto 82nd Street heading eastbound, and 10 miles per hour on Drexel Avenue. Defendant further testified that he stopped at the stop sign at the intersection of 82nd Street and Maryland Avenue, waited for two cars heading eastbound on 82nd to pass, and then turned right. Based on the parties' stipulated distance traveled for each of those streets, Defendant would have driven the route in about one minute and eleven seconds, not including the time Defendant waited for cars to pass after stopping at the stop sign. Based on the record, and as explained herein, Defendant's self-serving version of events lacks credibility.

[3] The parties stipulated that the distance on Maryland Avenue between 82nd and 83rd Streets is 528 feet, the distance on 82nd Street between Maryland Avenue and Drexel Avenue is 331 feet, and the distance on Drexel Avenue between 82nd and 83rd Streets is 528 feet.

[4] Defense Exhibit C is a defense-made video of a car driving the same route driven by the Defendant. The car stops at stop signs at the intersections of Maryland Ave and 82nd Street as well as 82nd and Drexel Street. The car takes one minute and thirty seconds to drive the route, starting at Maryland and 82nd, heading toward 83rd, and ending at 82nd and Drexel, with a speed averaging at 10.5 miles per hour.

[5] The BWC videos of the actual incident confirm that the patrol car traveled the entire route in 33.5 seconds, at an average of about 28 miles per hour. In order words, the patrol car traveled the distance in less than half the time Defendant would have, according to his testimony. Based on the officers' credible testimony that they saw Defendant driving in front of them before turning onto Maryland, the record confirms that, had the Defendant been driving at his testified speed, the patrol car would have caught up to Defendant's car prior to the intersection of 82nd and Drexel, or, alternatively, the patrol car would have crashed into the back of the Defendant's car, neither of which occurred on the BWC footage. In addition to these simple math calculations, both Officers Kinney and Franson credibly testified that Defendant was traveling well above the speed limit and did not stop at the intersection of 82nd and Maryland, further discrediting Defendant's testimony.

[6] For instance, Defendant testified that he was on the phone with his girlfriend while driving and during the traffic stop, and Defendant denied that Officer Kinney helped Defendant communicate with his girlfriend after he was handcuffed. Officer Kinney's BWC, however, clearly shows that Defendant was not on the phone when Officer Kinney first approached the vehicle at the traffic stop. Additionally, the BWC later shows that while Defendant was handcuffed and sitting in the police car, he asks Officer Kinney to call his girlfriend using Defendant's phone. With Defendant's consent and instructions, Officer Kinney unlocks Defendant's phone (which has no active call), calls Defendant's girlfriend, and then hands the phone to Defendant. Additionally, Defendant testified that when he previously encountered Officers Kinney and Franson, Defendant was not driving a car; Defendant claimed that he was outside a white jeep. Officers Kinney and Franson, however, credibly testified that they had

and the following factual findings below take into consideration the Court's firsthand assessments of the three testifying witnesses.

### B. Sequence of Events

On August 11, 2020, while on normal patrol in an unmarked police car, Officer Franson was driving eastbound on 83rd Street near Cottage Avenue with his partner Officer Kinney in the passenger seat. Both Officers had a BWC, but the police car did not have a dashboard camera. Officer Kinney testified that he saw someone driving recklessly, also heading eastbound on 83rd Street, and pointed out the brown vehicle to Officer Franson. Officer Franson sped up and, after the brown car turned left, northbound onto Maryland Avene, the officer briefly turned his emergency lights to alert traffic as he made the same turn, attempting to catch up to the brown car. Once on Maryland Avenue, Officer Franson turned off the emergency lights,[7] and the officers observed the brown car about halfway down the block exceeding the residential area speed limit of 25 miles per hour. As Officer Franson started driving (over 30 miles per hour) to catch up to the brown car, the officers put on their seat belts.

---

previously conducted a traffic stop when Defendant was driving a white jeep and let him go with a warning. Officer Kinney's BWC further supports this testimony when he says to Defendant that he was "driving like a maniac again," and Defendant makes no denial and references the "white truck" himself in his response.

[7] Based upon his training and experience, Officer Franson testified that if he had revealed his emergency lights before catching up to the target vehicle, he believed the car could attempt to elude the police car. Since there was no traffic on Maryland Avenue, Officer Franson did not need emergency lights at that point and wanted to get close enough to view the brown car's license plate (at a minimum) before activating his lights and stopping the vehicle.

While still on Maryland Avenue, and not yet caught-up to the brown car, Officers Kinney and Franson observed the brown car fail to stop at the stop sign at Maryland Avenue and 82nd Street and then turn right, eastbound on 82nd Street. When the officers reached the intersection themselves, the brown car was far ahead of them and already turning right, southbound onto Drexel Avenue. The officers pursued, and once on Drexel Avenue, the officers observed the brown car almost halfway down the block. At the end of Drexel Avenue, just before the intersection with 83rd Street, the brown car pulled over to the left side of the street, and Officer Franson turned on his emergency lights to conduct the traffic stop.

Officer Kinney exited the police car and approached the stopped vehicle. Officer Franson stayed in the police car to write down the plate number (in case the brown car sped off). As Officer Kinney approached the brown car, he asked the driver, "You good?" and asked to see the driver's hands. At this point (but not before), Officer Kinney recognized the driver of the brown car as Defendant Brikyle Walls, whom Officers Kinney and Franson had stopped within the previous week.[8]

As he approached the car, Officer Kinney commented that Defendant had been driving like a maniac again; Defendant responded that he was just trying to get home. Officer Kinney asked Defendant (for officer safety purposes) if there were any weapons in the car, and Defendant lied to the officers by responding "No." As Officer Kinney moved around to the driver's side of Defendant's car, Defendant opened the

---

[8] At the previous stop, Defendant committed a traffic violation in a different car, but the officers only gave him a warning and did not issue Defendant a ticket. During this earlier stop, Officer Kinney had run Defendant's name and learned that Defendant was a convicted felon.

car door without being instructed to do so. After Defendant gave Officer Kinney his Illinois State ID (not a driver's license), Officer Kinney asked Defendant to step out of the vehicle since he was driving without a license and Officer Kinney had legitimate concerns for officer safety. Officer Franson moved to temporarily detain the Defendant in handcuffs, and as he did so, Defendant stated that there was, in fact, a gun in the car. Based upon the prior stop, Officer Kinney knew that Defendant could not lawfully be in possession of a gun as a convicted felon. Officer Kinney asked where the gun was, and Defendant responded it was in the center console. Officer Kinney got gloves to preserve the integrity of the weapon and evidence collection, then removed the gun from the center console and disarmed it.

Based upon probable cause, the Defendant was then arrested. As part of the arrest, Officer Franson wrote the Defendant two traffic tickets[9] as follows: (1) driving on a suspended/revoked license; and (2) failing to stop at a stop sign.[10] Officer Kinney

---

[9] The record confirms the reasonableness of the officers' decision not to write additional traffic tickets. Even though Officer Franson knew Defendant had driven over the speed limit, the patrol car did not have a radar gun, and Officer Franson already possessed a basis to write other similar traffic infractions. Additionally, Officer Franson reasonably chose not to write Defendant for a fleeing and eluding infraction, because the officers did not turn on the emergency lights in view of the Defendant until 83rd and Drexel when they conducted the traffic stop. Lastly, the officers also knew the Defendant would be facing felony charges for the gun violation anyway, so they had no need (legal or otherwise) to write any tickets at all, much less write every possible traffic ticket.

[10] Officer Franson first wrote the ticket for driving on a suspended/revoked license and listed the location of infraction as the place where the officers conducted the traffic stop, 8300 South Drexel. Officer Franson copied that address onto the second ticket, failure to stop at a stop sign, even though that infraction technically took place at 82nd and Maryland. The Court finds Officer Franson's explanation for the error reasonable and accepts that this one mistake does not discredit his testimony that Defendant failed to stop at the stop sign at 82nd and Maryland. Additionally, the fact that Officer Franson answered "yes" to the grand jury question, "Did your investigation reveal that on August 11th of 2020 officers were on routine patrol when they observed defendant was the driver and sole occupant of a vehicle that was curbed for disobeying a stop sign at 8300 South Drexel in Chicago, Cook County, Illinois?" likewise does not undermine his credibility, in light of the form of, and multiple parts contained within, the leading question asked. The Court credits Officer Franson's understanding of the compound question that Defendant was stopped at 8300 South Drexel, and this error does not

wrote the CB and RD reports, which each list that Defendant's failure to stop at a stop sign occurred at 82nd Street and Maryland.

### III.  Conclusions of Law

Defendant argues that the firearm and his statement from the stop must be suppressed because the stop was unlawful in the first instance. The factual record, however, undermines his claim.

Officers may lawfully stop a car if the officer has reasonable suspicion that the car committed a traffic offense, even a minor one. *See Rodriguez v. United States*, 575 U.S. 348, 354 (2015); *United States v. Jackson*, 962 F.3d 353, 357 (7th Cir. 2020). Reasonable suspicion exists "when an officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *United States v. Pace*, 48 F.4th 741, 749 (7th Cir. 2022) (quoting *United States v. Eymann*, 962 F.3d 273, 282 (7th Cir. 2020)). Although reasonable suspicion "requires something less than what is necessary to show probable cause, it requires more than a mere 'hunch.'" *Id.* (quoting *United States v. Ienco*, 182 F.3d 517, 523 (7th Cir. 1999))*; see also United States v. Rodriguez-Escalera*, 884 F.3d 661, 667–68 (7th Cir. 2018) ("To pull a car over for a brief investigatory stop, a police officer must have 'at least [an] articulable and reasonable suspicion' that the particular person stopped is breaking the law.") (quoting *Delaware v. Prouse*, 440 U.S. 648, 663 (1979)). An officer's subjective intent for

---

negate Officer Franson's testimony (confirmed by other parts of the record) that he saw Defendant run a stop sign at 82nd and Maryland. Additionally, as noted above, Defendant's testimony to the opposite effect remains incredible, and the police reports otherwise list the correct address of the traffic infraction.

stopping the car (i.e., recognizing the driver) is not relevant to assessing "the reasonableness" of the officer's actions, which remains an objective inquiry. *United States v. Jackson*, 962 F.3d 353, 358 (7th Cir. 2020) (quoting *United States v. Bullock*, 632 F.3d 1004, 1012 (7th Cir. 2011)).

In this case, the officers possessed specific and articulable facts, as required for reasonable suspicion, that Defendant had committed several traffic offenses. The officers observed Defendant speeding in a residential area and failing to stop at the Maryland and 82nd stop sign—two obvious traffic violations. Defendant argues that the officers' stated basis for the stop was pretextual because they recognized the Defendant and simply pulled him over for that reason.[11] Both Officer Kinney and Officer Franson, however, credibly testified that neither recognized the Defendant until after they conducted the traffic stop, and the BWC bolsters that testimony.[12]

---

[11] As noted above, even if the officers had recognized Defendant, the officers' subjective intent is not relevant in the reasonableness analysis. Defendant's traffic infractions alone were sufficient for the officers to make a valid traffic stop. *See Jackson*, 962 F.3d at 358.

[12] Likewise, the record supports the lawfulness of the officers' decision to ask Defendant out of the car and detain him—a detention which only lasted less than a few seconds before Defendant made his incriminating statements about possessing the firearm. Without question, an officer conducting a valid traffic stop "can detain the occupants of the vehicle long enough to accomplish the purpose of the stop," and, "as part of the stop, police may ask the vehicle's occupants 'a moderate number of questions' and request their identification." *United States v. Muriel*, 418 F.3d 720, 726 (7th Cir. 2005) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984)); *United States v. Moore*, 375 F.3d 580, 582 (7th Cir. 2002) (Background check and questioning of passengers remains a lawful part of a traffic stop). Even though a stop might become unlawful if it is "prolonged beyond the time reasonably required to complete the mission," the "mission" itself may lawfully include not only addressing the violation that warranted the stop, but also attending to related safety concerns. *United States v. Lewis*, 920 F.3d 483, 491 (7th Cir. 2019); *Rodriguez v. United States*, 575 U.S. 348, 354 (2015)); s*ee also Arizona v. Johnson*, 555 U.S. 323, 331 (2009) (once police have lawfully stopped a car for a traffic violation officers may, consistent with the Constitution, order the driver and passengers out of the vehicle pending completion of the stop) (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 111–12 (1977); and *Maryland v. Wilson*, 519 U.S. 408, 415 (1997)). As Officer Kinney approached the driver side of the car alone (and recognizing the Defendant as a convicted felon), the Defendant opened the car door on his own, creating uncertainty as to his intentions. *See Murphy v. Alford*, No. 11-cv-01660, 2013 WL 3043675, at *6 (S.D. Ind. June 17, 2013) (finding that once driver in a traffic stop "opened his car door . . . a reasonable

Finally, Defendant's statement to the police disclosing the presence of the firearm remains admissible, even though the officers had not yet given *Miranda* warnings. Under *Miranda v. Arizona*, 384 U.S. 436 (1966), the admissibility of a custodial statement remains conditioned upon prior warnings regarding the suspect's rights against self-incrimination. *Missouri v. Seibert*, 542 U.S. 600, 608 (2004). Before "*Miranda* warnings are required, however, the suspect must be both 'in custody' and subjected to 'interrogation.'" *United States v. Thompson*, 496 F.3d 807, 810 (7th Cir. 2007) (quoting *United States v. Barker*, 467 F.3d 625, 628 (7th Cir. 2006)) (cleaned up).

In this case, officers initially conducted a routine traffic stop, "analogous to a *Terry* stop," which created no obligation to provide *Miranda* warnings to Defendant. *U.S. v. Johnson*, 680 F.3d 966, 974–75 (7th Cir. 2012).[13] Here, Officer Kinney lawfully conducted a traffic stop and later detained Defendant based upon officer safety, and thus, Defendant was "temporarily detained" and "not 'in custody' for the purposes of *Miranda*." *Id.* at 975. Based upon the record, officers did ot place the Defendant under arrest until after he volunteered his admission about possessing the gun in the car. As such, Defendant's statement did not occur within the bounds of

---

officer in the situation could interpret" the driver's action "as a danger to officer safety"). Defendant then failed to provide a valid driver's license (which was itself an arrestable traffic infraction). Based upon the totality of the circumstances, Officer Kinney had reasonable concerns for officer safety and Defendant's momentary detention for a few seconds was lawful, especially where he was subject to a lawful arrest anyway for driving without a license.

[13] In a rare situation, a *Terry* stop might require *Miranda*-like warnings based upon the stop's scope and duration. *See U.S. v. Smith*, 3 F.3d 1088, 1096–98 (7th Cir. 1993); *Terry v. Ohio*, 392 U.S. 1 (1968). That situation, however, does not apply here given the nature of the routine traffic stop and Defendant's momentary detention at the time of his statement.

*Miranda* and officers were not obligated to provide *Miranda* warnings.

Moreover, even if *Miranda* warnings were necessary prior to the statement, the testimony and body camera footage demonstrate that Defendant's statement about the gun in his car did not stem from any custodial interrogation. To be sure, "interrogation" means more than just "express questioning" and it includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (interrogation includes questioning or its "functional equivalent"); *United States v. Johnson*, 680 F.3d at 974. But the Fifth Amendment does not bar volunteered statements of any kind. *Miranda*, 384 U.S. at 478. Thus, if a defendant makes a statement in response to words or actions by officers that do not constitute custodial interrogation, or if he initiates communications, the law does not prohibit the officers from listening to his voluntary statement. *United States v. Jones*, 600 F.3d 847, 855 (7th Cir. 2010).

The factual record (including the body camera footage) shows that Officer Kinney initially asked about the presence of a weapon (which Defendant denied) before detaining the Defendant; Officer Kinney then asked him out of the car. While Officer Franson began the process of putting Defendant in handcuffs, Officer Franson asked routine traffic-stop questions about the ownership and registration of the car. Only after these routine traffic-related questions, did Defendant voluntarily admit that he wanted to "tell the truth" acknowledging that he had a gun in the car.

Defendant's statement about the gun does not flow from the officers' previous actions, nor from any implicit or explicit custodial interrogation; Defendant offered the statement voluntarily.[14]

Given this factual record, the absence of *Miranda* warnings does not mandate the suppression of any evidence. *Id.*; *see also United States v. Hendrix*, 509 F.3d 362, 374 (7th Cir. 2007) (finding that "voluntary statements"—that is, statements that are not the result of "compelling influences, psychological ploys, or direct questioning"— are not subject to *Miranda* warnings) (citing *Arizona v. Mauro*, 481 U.S. 520, 529 (1987); and *United States v. Jackson*, 189 F.3d 502, 510 (7th Cir. 1999)); *United States v. Abdulla*, 294 F.3d 830, 836 (7th Cir. 2002) (finding no *Miranda* violation, in part, because "the agents had only been with Mr. Abdulla for a very short time" before his statement and because there was "no indication that any pressure was put on him."); *Arizona v. Mauro*, 481 U.S. at 527 (finding no *Miranda* violation where the officer asked the defendant "no questions . . . about the crime or his conduct" and where the officer's decision to allow the defendant to see his wife was not "the kind of

---

[14] To the extent that Officer Kinney asked about a gun prior to the Defendant being handcuffed, Defendant's voluntary admission about a gun after detention does not pose any constitutional error. For officer safety, officers routinely ask about the presence of a gun at a traffic stop without the need of *Miranda* warnings. *See, e.g.*, *United States v. Lyons*, 856 F. Supp. 2d 946, 956 (C.D. Ill. 2012) (relying on *Muriel*, 418 F.3d at 726 to state that during traffic stop, the officer "was entitled to ask Defendant if he had a gun"). Additionally, the record does not support a sufficient connection between Officer Kinney's actions in posing the earlier question to Defendant's challenged admission; Defendant already answered the prior question by denying the presence of a gun, Officer Kinney moved on without any follow-up, and neither officer revisited the topic following Defendant's detention in handcuffs. Further, there exists no indication that the officers' actions were a "strategy adapted to undermine the *Miranda* warnings." *Cf. Seibert*, 542 U.S. at 616. Under the totality of the circumstances, Officer Kinney's initial and routine safety question failed to constitute custodial interrogation or its functional equivalent, and thus, this Court finds, as a factual matter, that the Defendant's later statement remained a voluntary statement.

psychological ploy that properly could be treated as the functional equivalent of interrogation").[15]

### III. Conclusion

Consistent with the above findings of fact and conclusions of law, this Court denies Defendant's motions to suppress [121].

Date: 12/13/2024

ENTERED:

_____
John Robert Blakey
United States District Judge

---

[15] Finally, even if Defendant's incriminating statement was suppressible, the recovery of the firearm would remain admissible. The factual record confirms that the officers would have lawfully arrested the Defendant for driving without a license in any event, and thus, the firearm would have been recovered during a routine inventory of the impounded car (which would have been towed given the absence of another lawful driver on scene). *U.S. v. Carwright*, 630 F.3d 610, 613–14 (7th Cir. 2010).